The Chief Justice
delivered the opinion of the court:
The defendant was tried and convicted in the Police Court upon an information charging him with, between the 6th day of March and the 9th day of July, 1891, unlawfully keeping, setting up and promoting and unlawfully being concerned, in divers manners, in managing a certain policy lottery, and a certain policy shop in the District of Columbia and in violation of the Act of Congress approved April 29, 1878. [20 Stát., p. 39.] The case comes to this court on a writ of error granted under the provisions of the Act of Congress approved March 3, 1891. [26 Stat., p. 849].
Upon the trial of the case a number of exceptions were taken to the rulings of the court, which are assigned as error. On the trial Sigmund J. Block was a witness on behalf of the United States, and he testified that he was an officer of the Metropolitan Police Force; that he had arrested the defendant on the 8th day of July, 1891, when the defendant was riding in a carriage with a man by the name of Baldwin; that the *407 witness stopped the carriage and in the bottom found a satchel; that he arrested Baldwin also at the same time; that said Baldwin was driving the carriage at the time of his arrest; that witness took this satchel into a watch house on the bridge and opened it and found a number of papers in the said satchel, being the papers hereto attached as exhibits, and all that were produced at the trial; that he then took defendant and said Baldwin to the station house where he took from the defendant a pocket-book containing $307 in money; that at the station, house the defendant said to witness that Baldwin was a friend of his, who travelled back and forth, and that he, the defendant, was the only party responsible for whatever was in the carriage; that he was an employee and not a backer, and that he would not give the backer away even if he had to serve six months in jail. Thereupon the United States, by its counsel, asked the said witness to state what the said papers were, in his opinion, which he took from the satchel, and thereupon the defendant objected because the papers were not shown to be connected with any policy lottery, and that the witness was not shown to be qualified as an expert to give any opinion as to what the papers were. Thereupon, and in response to inquiries by the court, he testified that his knowledge as an expert was derived solely by being an officer of said police force, and in that capacity collecting evidence in policy cases, and presenting the said cases to the District Attorney, and very frequent conversations had with a number of policy writers who had explained to him their business and their ways of transacting business; that he had thus acquainted himself'with the operations of policy players. Thereupon the court ruled that the witness might state what the said papers were, and in answer to a question which had been propounded by the counsel for the United States, the witness answered “these papers are policy papers of different dates.” Thereupon an exception was taken.
It is urged, first, that the witness did not qualify himself as an expert sufficiently to authorize him to testify. We think that the testimony of Mr. Block shows that he was *408 amply qualified to testify as an expert; that his experience, which he states; his familiarity with the modus operamdi of policy playing and the conducting of these lotteries was sufficient to authorize him to speak as an expert upon the subject.
It is further said that he was not authorized to give his opinion, or state what these papers were, until it had been shown that there was a scheme of lottery such as is charged in the information in this case. That wouljl only be at most a question of the order of introducing testimony. The court might permit the testimony to be introduced-, and if there should be a total failure of evidence to prove that an offense had been committed, and that there had been a policy lottery scheme which this defendant had been connected with in some manner as alleged in the information, the court would have been justified in withdrawing the testimony from the jury, but we think it was not a proper exception in view of the record of the case as presented to us at this time.
The second exception was also to testimony of the witness Block. He further stated that the policy papers or books, which were referred to in his previous testimony, represented transactions on the 6th and 7th days of July, 1891, and that ■ only one of them was dated on 7th day of July; that he knew that the said book bore that date because of the figures “77” on the top of it; that one Bowie was the writer of it; that when he got these papers and books from the defendant, the books were dead; that the betting had been determined and the books closed, and that none of them had the year marked on them, and that they were only useful as a record of what had been done. Thereupon the United States, by its counsel, asked the witness: “Do you know by looking at the papers and from the papers whether these papers had passed out of the writer’s hands into the backers?” Thereupon the defendant objected that the said evidence was incompetent and immaterial, and further, that unless the witness could testify of his personal knowledge the evidence was incompetent, and because the papers themselves were the best evidence. The court overruled the objection and the defendant *409 excepted. The witness answered: “Yes, I can tell by the hit list, which are on the papers in lead pencil, which can only be made up by the backers.” To this answer an exception was taken. The witness had already qualified himself as an expert, familiar with the scheme and the mode in which it is conducted, and his answer is based upon that knowledge as disclosed in the answer itself, as he does not profess to have seen, the papers pass from the writers to the backers, but from his knowledge of the mode of conducting that business, that knowledge having been previously disclosed, he states: “Yes, I can tell by the hit list, which are on the papers in lead pencil, which can only be made up by the backers.” We think it was perfectly competent for him to testify as to the meaning and purport of what he calls the “hit list” then and there found upon these papers, in the possession of the defendant. There was no error in the admission of this testimony.
When the evidence was concluded a number of prayers were presented by counsel for the defendant to the court for the jury and to the refusal to give some of them, and to the giving of some of them in a modified form the counsel for the defendant excepted.
The first prayer is as follows: ‘ ‘ The fact that the defendant had in his possession at the time of his arrest certain papers called policy books, or any other paraphernalia appertaining to policy lottery that had been previous to the day of his arrest used and were then of no value is not of itself sufficient to-warrant a conviction.” Whereupon the court said: “The first prayer is granted with this qualification: It is for the j ury to say what connection, if any, this defendant had with the scheme of policy lottery, and what, if any, value the papers had. In order to understand the force of this it is necessary to read the statute (which the court then read to the jury): I say to the jury that the mere possession of papers, unaccompanied by any other evidence tending to connect the defendant with policy lottery, and in the absence of anything on the face of the papers themselves which tend to connect him with it, would not be proper to base a conviction upon; *410 with this qualification it is granted.” We think there is no error in this modification of the first prayer and that it would have been erroneous to have given it without such modification, because 'the first prayer assumes the fact that these papers, which were found in the possession of the defendant, were shown absolutely by the evidence to be of no value,— that is, of no significance as evidence in the pending trial. This would have been to assume the whole case as presented to the jury to be in favor of the defendant which, we do not think the court would have been authorized to do. The modification and explanation of the rule given by the court was entirely proper and absolutely necessary, if the instruction was to be given to the jury at all.
The fifth and sixth prayers which were asked by the counsel for the defendant raise the principal question in the case. The fifth prayer is as follows: ‘‘The defendant cannot be convicted on evidence which shows that he was engaged in the lottery business in the State of Virginia. He must be shown beyond a reasonable doubt to have himself participated in the management of, or as promoter of a policy lottery in the District of Columbia before a conviction can be had.” Whereupon the court said to the jury: ‘‘This prayer is granted with this qualification: If he was engaged in the policy lottery business in the State of Virginia, of course he cannot be convicted here. But if he was concerned in any manner in the policy business in the District of Columbia, he is liable. If, for the purpose of violating the law, or for any other reason,, this scheme is carried on partly in the District of Columbia and partly in the State of Virginia, and the defendant, although located in the State of Virginia, by himself or through other parties, promotes policy in the District of Columbia,' he is liable. If this scheme is conducted partly in the State of Virginia, and the defendant in the State of Virginia, receives money collected by his associates or agents in the District of Columbia, and distributes the money through his agent or agents in the District of Columbia to the successful players, then he is concerned in the scheme in the District of Columbia. ’ ’
*411 The sixth prayer raises the same question, and is as follows: “Evidence showing that the defendant was engaged as clerk or otherwise in the State of Virginia in distributing papers and receiving money from persons whq were themselves engaged in the business of writing policy in the District of Columbia, is not sufficient to warrant the defendant’s conviction under the present information.” Whereupon the court overruled the prayer and declined to instruct the jury as therein set forth.
It will be seen that the question presented is an important one, and it is, whether a person can in Virginia conspire to promote a scheme of lottery which is to be partly carried on in the State of Virginia and partly in the District of Columbia, and although not himself personally violating the law so far as the District of Columbia is concerned, by actually coming into this jurisdiction and here doing some illegal act in the matter of promoting a lottery scheme, yet does so through his agents, shall be held to be connected with the scheme and amenable to criminal prosecution in the District.
There is a class of cases that hold that under such circumstances the party is liable whether the charge against him be that of committing a misdemeanor or felony. There is another class of cases that hold that the party committing a misdemeanor under such circumstances is liable, but not liable for committing a felony. There are other cases which hold that where a party engages in a scheme of that kind, promotes the commission of a crime in a jurisdiction where he is not present, and causes the thing to be done through the medium of an innocent agent, that he is liable, and the reason assigned is, that inasmuch as the innocent agent cannot be punished and as the law must be vindicated against somebody, the court must hold that the principal who conceived the crime in a foreign jurisdiction is responsible in the jurisdiction where the. crime, whether a misdemeanor or .a felony, was committed. There are other cases that hold that the party may be held amenable to the laws of the jurisdiction where the crime is committed, although he was absent *412 and never within the jurisdiction himself, where he promotes, conspires and causes the crime to he committed, whether the agent who actually committed the crime within the jurisdiction was an innocent or a guilty party.
In 34 Conn., p. 118, the State vs. John Grady, et al., the law was held by the judge delivering the opinion of the court to be as follows: 1 ‘The courts of this State will take -no cognizance of an offense committed in another State; but will take cognizance of an offense committed in this State by the procuration of a resident of another State who does not personally come here to commit the offense, whether committed by a guilty agent or not, and whether a misdemeanor or felony. The doctrine that a resident of one State who procured a felony to be committed, in another State by a guilty agent, without being personally present to assist in the commission of the offense, cannot be punished in the State where the offense is committed has never been recognized by our courts, is inconsistent with our system of jurisprudence, does not rest on any just foundation, tends to encourage the commission of crime, and should be repudiated generally.”
In a case in 7 Sergeant and Rawles, p. 477, Commonwealth vs. Gillespie and others, it is said: “One may be made liable criminally for the acts of his agent, if he had a participation in them, and the jury may deduce such participation from circumstantial evidence. ” It appeared in the trial of the case that one of the parties indicted was within the jurisdiction and committed the crime, which was selling lottery tickets, in Pennsylvania, in accordance with the procuration of the other defendant, who resided in the State of New York, and who was never in the State of Pennsylvania at anytime, or at least during the time when the violation of the law of Pennsylvania was committed. The court in disposing of the case said: “It makes no difference where Gillespie resided if he conspired to sell New York lottery tickets in Pennsylvania, with his agent, and the agent effected the act, the object of the unlawful conspirac3'-, he is answerable criminally to our'laws. In this offense there is no accessory. It must be recollected that conspiracy *413 ís a matter of inference deducible from the acts of the party-accused, done in pursuance of an apparent criminal purpose in common between them and which rarely are confined to one place, and if the parties are linked in one community of design and of interest, there can be no good reason why both may not be tried where one distinct overt act is committed, for he who procures another to commit a misdemeanor is guilty of the fact in whatever place it is committed by the procuree. For if Gillespie was not accountable to our laws, then this offense would, within our State, be committed by him with impunity; for that consequence must follow from its being held to be no crime for him to reside in New York and procure the selling of lottery tickets in Pennsylvania, and the argument must rest on the position that he owed no obedience to these laws and had been guilty of no offense in contravening them.”
This case seems, so far as a misdemeanor is concerned, to sustain fully the decision of. the court in Connecticut. In the Pennsylvania case the co-defendant, the party who actually sold the lottery ticket, was not innocent but guilty, yet the court held that the New York defendant who procured the other defendant to sell the ticket in violation of the law of Pennsylvania was equally guilty.
In 21 Wend., The People vs. Rathbun, p. 509, it was held “In respect to misdemeanors, where part of the offense is committed in one county and part in another the rule of law in respect to the venue is otherwise; then the trial may be had in either county,” This was an indictment for uttering and issuing a promissory note with forged endorsements upon it. It appears that the forgery was actually committed in one county and the papers sent in a letter to a party in another county who passed the instrument, or who received it and then put it into circulation. The case was, first, as to where the crime was committed, and secondly, whether the party who originated the forgery, who actually forged the signature, was guilty. The court first determined that the crime was committed in the place where the instrument was published, and that it was not published *414 until it reached the hands of the party to whom it was sent by the person who had forged the name; and secondly, they hold that the participation of the party who wrote the name falsely in the commission of the crime was such that he was liable, although he did not do that part of the work in the county where the crime was actually committed. The court reviewed the authorities on this question and said: “In no view, therefore, do I think that the decisions cited concerning misdemeanors can be applied to the case at bar. In defining and trying felonies the law is more careful to resolve the offence into the separate acts which produce it with a view to distinguish between principal and accessory, whereas in misdemeanors all concerned are principals and every act tending towards its commission seems itself to be an offense of the same grade with the final act or offense — indeed, to be identified with it. ’ ’ The court further says: ‘ ‘Thus in Rex vs. Burdett, 4 Barn. & Aid., 126, Best, J., speaking of a libel, .says: ‘The moment a man delivers a libel from his hands, his control over it is gone. He has shot his arrow- and it does not depend upon him whether it hits the mark or not. There is an end of the locus penitentia; his offense is complete; all that depends upon him is consummated and from that moment, upon every principle of common sense, he is liable to be called upon to answer for his act. It is evident that to import such a doctrine into the law of felony would at once subvert the law of principal and accessory, and what is more pertinent to the case before us, it would be to overrule several decisions which I have cited denying the application of that doctrine as to felonies committed either by force or fraud.’ ” This case is one of the class of cases, which I have before mentioned, that hold that, as to misdemeanors the parties may be held .to be liable for participating in a crime in a jurisdiction where they were not present at the time that the crime was actually committed, but for having had some participation in the matter preceding the actual consummation of the crime in another jurisdiction, yet, say under the same circumstances, if the crime amounts to a felony they cannot be held liable.
*415 In the case of Adams vs. People, 1 Comstock, 177, Adams was indicted in the city of New York for obtaining money from a firm of commission merchants in that State by the use of a fictitious receipt signed by a broker in Ohio, resulting in the delivery to him of a quantity of provisions for the use, and subject to the order, of the firm. The defendant pleaded that he was a natural born citizen of Ohio, had always resided there and had never been within the State of New York; that the false receipt and drafts mentioned were drawn in Ohio, and the offense was committed by the receipt being presented to a firm in New York, an innocent agent of the defendant, employed by him, while he remained in Ohio. It was held that the plea was bad and that the defendant was properly indicted in the State of New York where the offence was committed, and that he was liable to indictment as a principal although-he was not a resident of the State of New York and did nothing towards committing the crime when personally within its jurisdiction. This is one of a class of cases where, as counsel argued, the party is held because the agent who consummates the crime in the State where it is actually committed is an innocent agent. It is true that in the statement of the propositions of fact the court embraces what was true in that case, that the party who did present the receipt in New York and obtain the money upon it, was an innocent party and was imposed upon; but in the opinion of the court, in its discussion of the law, no point whatever is made of the fact that the agent was innocent, but states the law to be as held by the Supreme Court of the State of Connecticut in very strong language, as follows: “Allegiance to a particular power so far from drawing under it the exclusive jurisdiction to try and punish, is not even one of the elements necessary to confer it. A pirate born in Kngland, where his crime is recognized and punished by the common law, may be convicted and sentenced under the courts of the United States, or those of any other nation. If a State may punish a foreigner who owes it no allegiance for acts committed on the highway of nations, there would seem to be no doubt of its jurisdiction where the offense was committed by any means within its *416 territory. Robbery upon land is as much opposed to the law of nature, as robbery upon the high seas. In each case the individual forfeits all protection of his government and the ■conditions of jurisdiction in the two cases is attributable to the right of domain and not to the doctrine of allegiance. Vattel says that the ‘sovereign who is injured by the subjects ■of another nation takes satisfaction for the offense himself when he meets with the beligerent in his own territory or in a free place, as in the open sea.’ And again, after remarking that it would be unjust to impute to the sovereign every fault •committed by a subject against a citizen of another country, he says: ‘If the nation has in her power the individual who has done the injury, she may without scruple bring him to justice and punishment.’ In this case the prisoner admits that by means of false pretenses and with an intent feloniously to cheat and defraud he obtained from citizens of this State the sum of $28,000 through the instrumentality of innocent ■agents, and it appears that afterwards he voluntarily came within the territory of the State where the crime was committed. I think he may be rightfully punished. He has violated ■a law to which he owed allegiance, for it was written upon his own conscience and obligatory everywhere. To that law the statute of the State had affixed a penalty to be enforced in her own tribunals for the protection of her own citizens. The immunity he enjoyed at home from arrest and punishment was not due to him as a criminal, not as a citizen of Ohio, but because he had injured no one whom the State was bound to protect, and because the inviolability of its territory was an essential to its sovereignty and independence. The prisoner knew that through his agent he was defrauding those who were entitled to the protection of our laws, and he cannot be permitted to say that he did not know that it was unlawful to cheat in New York as well as in Ohio.”
The doctrine enunciated in this case, and the reasoning of the court in the Connecticut case especially, receives our approval. There are cases cited by counsel for defendant which seem to sustain the contrary doctrine that a party 'under such circumstances cannot be held answerable in a *417 jurisdiction where he did no overt act towards committing the crime, although we think such cases are very rare as to misdemeanors.
So far as we know the question has never been decided in the District — and it is for us to say what shall be the law followed by the courts here. We are of the opinion that the Supreme Court of Connecticut has established the true rule and has given the true reason therefor. The reasbns given by the courts holding differently are unsatisfactory. If the party out of the State is actually guilty of promoting and inciting the commission of the crime within the State, he actually violates the law and outrages justice as much, so if the agent that he secures to commit the crime be also guilty, as though he imposed upon an innocent party who might commit the criminal act in such way that he, the agent, would not be subject to criminal prosecution. We therefore hold that the court committed no error in refusing to give the instruction No. 6, as requested, and in giving No. 5, with the modification.
The court was requested to' instruct the jury as follows: “The court instructs the jury that upon the trial of a criminal cause, if a reasonable doubt of facts necessary to convict the accused is raised in the minds of the jury, by the evidence itself, or by ingenuity of counsel, upon any hypothesis reasonably consistent with the evidence, that doubt is decisive in favor of the defendant’s acquittal.” Whereupon the court said to the jury: “You have nothing to do with reasonable doubts raised by the ingenuity of counsel; you are to be guided by the testimony of the case. This prayer is granted with the omission of the words ‘or by the ingenuity of counsel.’ The doubts which are to affect you are the doubts raised by the evidence in the case, as it presents itself to you, and not the doubts conjured up by the ingenuity of counsel. In nine cases out of ten, defendants are acquitted not upon any doubt created by the evidence but by the ingenuity of counsel. Counsel have a right to display their ingenuity in arguing to you what they claim the evidence proves, but that is all. You are bound of course to give the *418 defendant the benefit of all reasonable doubt. Courts have from time to time endeavored in different ways to define what is a legal reasonable doubt, and usually the jury have, under their arbitrary directions, as much trouble to ascertain what kind of doubt is to influence them as they have to ascertain wrhat the testimony proves. That kind of doubt, gentlemen, is this: When the testimony, fairly considered, fails to satisfy you- upon any point mentioned of the defendant’s guilt; in other words, when you hesitate short of full conviction of guilt, then the defendant is entitled to such a doubt and should be acquitted.”
We do not think there is error in this exception prejudicial to the defendant. In the first place, it would be error for the court to say to the jury that they might regard as a reasonable doubt somethixig that might be raised by the ingenuity of counsel. It would be véry hard indeed for a jury to tell what would amouxxt to a doubt raised by the ingenuity of counsel ixi discussing the evidexice. The true office of counsel in discussixig the evidence was properly stated by the court to the jury; to say the least, the clause stricken out by the court as included in the prayer was liable to mislead the jury to giving some undue importance to the “ingenuity” of counsel.
The doubt that a jury must entertaixx, is a doubt that must arise from the state of the evidenee itself. It must be a doubt produced in the minds of the jury as to the guilt of the defendant for want of sufficient proof to satisfy them of the existence of some material fact necessary to be proven in order to authorize them to find a verdict of guilty. We think that the court was not only required to modify this prayer as it did, but that it fully and fairly gave to the jury the law on this subject.
The 15th prayer of the defendant was as follows: “The court instructs the jury that the evidence offered by the United States is insufficient to warrant -a conviction of the defendant, and he ought to be acquitted.” The court refused the prayer. -It simpty raised the questioxi whether there was such evidence as authorized the court to submit *419 the case to the jury. If the law had been held to be otherwise than as the court held it, upon the question as to where this crime was committed, and as to what part the defendant had in the commission of a violation of the statute in the District of Columbia, it might have presented a different question as to the facts from what it does now; but inasmuch as we have affirmed the rulings of the court below upon the questions of law, the case stands in this way: If the jury were convinced that the defendant was concerned in promoting a lottery scheme in the State of Virginia, some part of which was to be consummated and performed in the District of Columbia, with the knowledge of the defendant and through his efforts in whole or in part, and to the extent charged in the information, then they were justified under the instructions of the court, which we hold to have been right, and the evidence shown in the record, in finding that the defendant was guilty.

The ftdgment of the court below is therefore affirmed.